Filed 3/26/15  Redlands Good Neighbor Coalition v. City of Redlands CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| REDLANDS GOOD NEIGHBOR COALITION, | |
| Plaintiff and Appellant, | E060138 |
| v. | (Super.Ct.No. CIVDS1211890) |
| CITY OF REDLANDS, | O P I N I O N |
| Defendant and Respondent; | |
| WALMART STORES, INC., | |
| Real Party in Interest and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  Donald R. Alvarez, Judge.  Affirmed.

Briggs Law Corporation, Cory J. Briggs, Mekaela M. Gladden, and Anthony N. Kim for Plaintiff and Appellant.

1

Best Best & Krieger, Michelle Ouellette and Sarah E. Owsowitz for Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, Arthur J. Friedman and Alexander L. Merritt for Real Party in Interest and Respondent.

## I.  INTRODUCTION

Plaintiff and appellant, Redlands Good Neighbor Coalition (RGNC), a non-profit social advocacy organization, appeals from the judgment denying its petition for a writ of mandate setting aside resolutions adopted by defendant and respondent, City of Redlands (the City), approving the Redlands Crossing Center project (the project), a 275,500-square-foot shopping center anchored by a "super" Walmart store, and certifying an environmental impact report (EIR) for the project.[1]

RGNC claims the City violated sections 66473.5 and 66474 of the Subdivision Map Act (Gov. Code, § 66410-66499.37),[2] by approving a tentative parcel map (TPM) for the project, namely, TPM 19060, that conflicts with the Design and Preservation Element of the City's general plan.  RGNC also claims the City violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) in certifying

---

[1] In another writ proceeding, a coalition of members called "For Accountability in Redlands" or FAIR, appeals from a separate judgment entered by the trial court, denying FAIR's writ petition to set aside the same project approvals RGNC challenges in this writ proceeding.  (*For Accountability in Redlands v. City of Redlands*, Riverside County Superior Court case No. CIVDS1300289, Court of Appeal, Fourth District, Division Two case No. E060756.)  FAIR and RGNC are represented by the same counsel.

[2] All further statutory references are to the Government Code unless otherwise indicated.

2

the EIR for the project that inadequately addressed the project's impacts on aesthetics, specifically on Redlands's historical and agricultural "community character" and views of the San Bernardino Mountains. Lastly, RGNC claims the EIR failed to analyze the project's alleged inconsistencies with the City's general plan.

The City, joined by real party in interest and respondent, Walmart Stores, Inc. (Walmart) (collectively respondents), argues RGNC failed to exhaust its administrative remedies and is therefore barred from pursuing its Subdivision Map Act claims. Alternatively, respondents claim ample evidence supports the City's findings that TPM 19060 is consistent with the City's general plan, and the EIR adequately addressed the project's impacts on aesthetics and its consistency with the general plan. We affirm the judgment.

## II.  BACKGROUND

A. *The Project*

The project involves the development of a 275,500-square-foot regional retail and commercial center, built on approximately 32.97 acres at the southeast corner of Tennessee Street and San Bernardino Avenue, immediately east of Interstate 210. The project would be anchored by a 215,000-square-foot Walmart store, open 24 hours a day, seven days a week. An additional 60,500 square feet of space would be used for other commercial uses, including fast food restaurants. The project site consists of vacant, fallow agricultural land, formerly used as an orchard. Three residences were on the

project site from the 1930's until two were removed in the early 1990's and the third was removed in 2002.

The project site is designated "commercial" in the City's general plan, allowing for a variety of uses, including shopping centers and business parks. The project site also lies within the boundaries of the East Valley Corridor Specific Plan (the EVCSP), which the City adopted in 1989 "to refine General Plan policies" for the East Valley Corridor—a 4,000-acre planning area in the eastern portion of the San Bernardino Valley comprised mostly of vacant land, including the project site.

The general plan envisions the EVCSP area "a high-quality business park environment" and as a vehicle for changing Redlands "from a labor exporting to a labor importing community." When fully built in 2028, the EVCSP is expected to support 90,000 jobs and "bring change on a scale Redlands has not experienced." The general plan describes the EVCSP area "the best, perhaps only, location capable of attracting the office, high-tech and distribution jobs the eastern portion of the San Bernardino Valley needs," and states the EVCSP "will reduce potential demand for retail, office, and industrial space elsewhere in the [City], thereby neutralizing pressures that might otherwise change the appearance of the older city."[3]

---

[3] In contrast to the EVCSP, the older downtown area of Redlands is governed by the Downtown Redlands Specific Plan, which "makes specific proposals for the preservation and development of the downtown area," north of Redlands Boulevard. The Downtown Redlands Specific Plan is intended to preserve the "historic resources and distinct character of [the downtown area]."

In addition to the general plan and the EVCSP, the project site is governed by the Cities Pavilion Concept Plan (Concept Plan), which establishes planning objectives to guide development. The project site is zoned "EVCSP" and "Concept Plan No. 4" (CP4), a development district of the EVCSP. As a CP4 requirement, the project will include a landscape buffer on the west side of Karon Street between the project site and residences on the eastern side of Karon Street. Allowable uses within a CP4 zone include general commercial district and administrative professional.

Walmart first presented the project to the planning commission and city council at public hearings in early 2009. During the next three years, Walmart's design team worked with city staff, members of the design review board, and an ad hoc committee of the planning commission, consisting of two planning commissioners, to address concerns raised during the 2009 hearings. As a result of this process, Walmart added amenities to the project, including an outdoor food court, enhanced entrances, and pedestrian walkways, and increased the landscaped area to 7.25 acres, or 22 percent of the 32.97-acre project site. Walmart also added "Redlands" design features to the project, including Spanish-style architecture, a corner landscape area featuring citrus trees, and "the generous use of river rock in the overall design." The landscape plan calls for 1,060 trees on the project site. The City expects the project will create 206 new jobs and generate $459,936 in annual net revenue to the City.

B.  *The City's Environmental Review and Approval of the Project*

The City circulated a draft EIR (DEIR) for the project from November 21, 2011 to January 28, 2012.  On March 16, 2012, the City released the final EIR (FEIR), including the City's responses to comments received on the DEIR.  The planning commission considered the project during three public hearings on March 14, March 27, and April 24, 2012.  At the April 24 hearing, the planning commission recommended that the city council certify the FEIR, by a unanimous vote of 7-0.

On July 18, 2012, the city council held a public hearing to consider whether to certify the FEIR as complying with CEQA, and whether to approve or deny the project.  Following several hours of public testimony and comments, the city council continued the project for further consideration.  Meanwhile, city staff prepared written responses to questions and comments raised by the public during the July 18 hearing.  At a further public hearing on October 16, 2012, the city council received additional public comments, then adopted resolution No. 7193 certifying the FEIR, adopting findings of fact, a statement of overriding considerations, and a mitigation monitoring and reporting program.  The City also adopted resolution No. 7192, approving a socio-economic cost benefit study; resolution No. 7194, approving a conditional use permit; and resolution No. 7198, approving TPM 19060.

In November 2012, RGNC petitioned the trial court for a writ of mandate setting aside the EIR certification and other project approvals.  RGNC also filed a complaint for declaratory and injunctive relief, challenging the project's compliance with CEQA, the

6

Planning and Zoning Law, and other laws. Following extensive briefing and a hearing on the merits, the trial court issued a 43-page ruling denying the petition and dismissing the complaint. In September 2013, judgment was entered in favor of the City and Walmart. RGNC timely appealed.

## III. DISCUSSION

A. *Substantial Evidence Supports the City's Findings, in Resolution No. 7198, That TPM 19060, and the Provisions for Its Design and Improvement, Were Consistent with the City's General Plan (§§ 66473.5, 66474)*

RGNC claims the City violated sections 66473.5 and 66474 of the Subdivision Map Act (§§ 66410-66499.37) in approving TPM 19060 for the project. Specifically, RGNC claims insufficient evidence supports the City's findings that TPM 19060, and the provisions for its design and improvement, were consistent with the City's general plan. (§ 66473.5.) RGNC argues that the design provisions of TPM 19060 are, in fact, inconsistent with several provisions of the Design and Preservation Element of the City's general plan, namely, general plan policies 3.10a, 3.10b, 3.10f, 3.20a, 3.20c, 3.20f, 3.24a, 3.24d, and 3.27b. RGNC also argues the City should have found that the design provisions of TPM 19060 were likely to cause significant environmental damage. (§ 66474, subd. (e).) Thus, RGNC claims the City's approval of TPM 19060 is invalid and must be set aside.

7

1. Exhaustion of Administrative Remedies

Respondents claim RGNC has failed to preserve its Subdivision Map Act claims for appeal. They argue RGNC did not exhaust its administrative remedies because no one, including RGNC members, objected to the adequacy of the City's section 66473.5 or 66474 findings during the administrative proceedings before the planning commission or the city council. (*City of Walnut Creek v. County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019-1020 [judicial review of administrative proceedings is confined to the issues raised in the record of the proceedings].) RGNC argues it was not required to exhaust its administrative remedies because the notice of the July 18, 2012, hearing before the city council did not include the warning specified in section 65009, subdivision (b)(2). We agree with RGNC.

Exhaustion of administrative remedies is a jurisdictional prerequisite to a judicial action challenging a public agency's planning decision. (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 993 [Fourth Dist., Div. Two].) Still, an agency may not rely on the exhaustion doctrine to preclude a judicial action challenging its planning decisions, unless the agency complies with notice requirements of section 65009. (*Ibid.*)

Section 65009 provides, in relevant part: "(b)(1) In an action or proceeding to attack, review, set aside, void, or annul a finding, determination, or decision of a public agency made *pursuant to this title* at a properly noticed public hearing, the issues raised shall be limited to those raised in the public hearing or in written correspondence

8

delivered to the public agency prior to, or at, the public hearing, except where the court finds either of the following:  [¶]  (A)  The issue could not have been raised at the public hearing by persons exercising reasonable diligence.  [¶]  (B)  The body conducting the public hearing prevented the issue from being raised at the public hearing.  [¶]  [(b)](2)  If a public agency desires the provisions of this subdivision to apply to a matter, it shall include in any public notice issued pursuant to this title a notice substantially stating all of the following:  'If you challenge the (nature of the proposed action) in court, you may be limited to raising only those issues you or someone else raised at the public hearing described in this notice, or in written correspondence delivered to the (public entity conducting the hearing) at, or prior to, the public hearing.'"  (Italics added.)

Respondents argue section 65009 does not apply to its Subdivision Map Act claims because the statute is not part of the Subdivision Map Act.  (§§ 66410-66499.37.)  Instead, they argue, section 66499.37, which provides for a 90-day limitations period on Subdivision Map Act claims (*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC* (2012) 205 Cal.App.4th 999, 1023), governs its claims.  Respondents are mistaken.  Though they correctly point out that section 66499.37 establishes a 90-day limitations period on Subdivision Map Act claims (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 27; § 65009, subd. (c)(1)(E)), section 65009 also applies to such claims.

Section 65009 applies to public agency decisions made "pursuant to this title" (§ 65009, subd (b)(1)), and, as used in the statute, "this title" ostensibly refers to title 7 of the Government Code, comprised of sections 65000 through 66499.50.  (§ 65000 ["This

9

title may be cited as the Planning and Zoning Law."].)  The Subdivision Map Act appears in division 2 of title 7, and includes sections 66410 through 66499.37.  (§ 66410 ["This division may be cited as the Subdivision Map Act."].)  Thus, the Subdivision Map Act is part of the Planning and Zoning Law, and section 65009 applies to all Planning and Zoning Law claims, including Subdivision Map Act claims.

A review of the notices of public hearing related to TPM 19060 shows the notice of the July 18 public hearing before the city council, at which the city council made its consistency findings and approved TPM 19060, but did not include the warning language of section 65009, subdivision (b)(2).[4]  Thus, respondents may not invoke the exhaustion doctrine to preclude RGNC's present action challenging the City's approval of TPM 19060.  (§ 65009, subd. (b)(2); *Corona-Norco Unified School Dist. v. City of Corona, supra,* 17 Cal.App.4th at p. 993.)

2. Section 66473.5

(a) *Relevant Background*

In adopting resolution No. 7198, the city council found TPM 19060 and the plans for its design and improvement were consistent with the City's general plan, the EVCSP, and CP4.  (§ 66473.5.)  The resolution states:  "TPM 19060 advances the goals and policies of the City of Redlands General Plan . . . as well as the [EVCSP] and [CP4]."

_____

[4] Section 65094 of the Planning and Zoning Law states:  "As used in this title, 'notice of a public hearing' means a notice that includes the date, time, and place of a public hearing, the identity of the hearing body or officer, a general explanation of the matter to be considered, and a general description, in text or by diagram, of the location of the real property, if any, that is the subject of the hearing."

10

The resolution explains TPM 19060 was consistent with the general plan because the project site is "a 'keystone' location within the EVCSP area due to its proximity to the 210 Freeway and San Bernardino Avenue Interchange, and as such, has the unique ability to create highly accessible and visible master planned development within contiguous property boundaries without the limitations imposed by property ownership patterns and existing street systems seen throughout most of the EVCSP area.  TPM 19060 creates a fully integrated development of retail and commercial uses rather than development of less desirable fragmented land uses spread out over several locations.  Also, because TPM 19060 consists of high-quality commercial components, it will create significant employment opportunities for the local/regional population."[5]

---

**5**  Resolution No. 7198 identified the following "Guiding Polices" of the general plan applicable to TPM 19060:  "Policy 4.62a - 'Develop the EVCSP so as to promote and facilitate high-quality commercial and industrial development within the Corridor area.'  [¶]  Policy 4.62g:  'Promote high quality development in the East Valley Corridor by protecting and enhancing existing amenities in the area, creating an identifiable community character, and adopting development standards and guidelines to ensure aesthetically pleasing design and maximum land use compatability.'  [¶]  Policy 4.62l: 'Maximize generation of employment opportunities in a region, which has a significant imbalance of housing versus employment opportunities.'  [¶]  Policy 4.62m:  'Facilitate location in the project area of a wide range of commercial uses to serve the region, local industry, and residential neighborhoods.'  [¶]  Policy 4.62ff:  'Ensure compatability between adjacent land use types within the Corridor area.'"  (Underlining omitted.)

Resolution No. 7198 also identified several "Implementing Polices" of the general plan applicable to TPM 19060:  "Policy 4.621 - 'Maximize generation of employment policies in a region which has a significant imbalance of housing versus employment opportunities.'  [¶]  Policy 4.62m - 'Facilitate location in project area of a wide range of commercial uses to serve the region, local industry, and residential neighborhoods.'  [¶] Policy 4.62u - 'Develop opportunities for community oriented services within the General Plan area.'  [¶]  Policy 4.62gg - 'Enhance the beauty of the East Valley Corridor and the overall quality of life for users and residents of the area.'"

11

Regarding the map's consistency with the EVCSP, the City's findings point out that, "[t]he EVCSP tailors the policies of the General Plan for the characteristics of the East Valley Corridor area and indicates that the intent is to develop the East Valley Corridor into commercial areas that will create employment opportunities for City residents, as well as commuters into the City from other areas. TPM 19060 will be near existing and proposed residential uses so that employees and visitors will not have to travel long distances, thereby reducing commuting distances and improving the jobs to housing ratio." The findings also state that TPM 19060 is consistent with the EVCSP because its design features will "result in an aesthetically high quality development."[6] Lastly, the findings explain that TPM 19060 is consistent with the CP4 requirements because it will include "a mixture of retail, commercial and administrative professional uses," with "maximum land use compatability," and will create "an aesthetically pleasing portal into the City from the 210 Freeway."

---

[6] In making these consistency findings, the City noted, "[m]uch like the General Plan, the EVCSP contains a number of polices intended to guide growth and development within the East Valley Corridor. The applicable EVCSP goals include: [¶] Goal EV2.0205(a) - 'Develop the EVCSP so as to facilitate the high-quality commercial, industrial, and residential development within the corridor area.' [¶] Goal EV2.0205(a)(1) - 'Maximize generation of employment opportunities in a region which has a significant imbalance of housing versus employment opportunities.' [¶] Goal EV2.0205(a)(2) - 'Facilitate location in the project area of a wide range of commercial uses to serve the region, local industry, and residential neighborhoods.' [¶] Goal EV2.02[0]5(a)(3) - 'Create a visually aesthetic appearance for the East Valley Corridor from the freeway as well as from the planning area.'"

12

(b) *Applicable Law and Standard of Review*

For development projects involving a proposed subdivision, like the project here, section 66473.5 prohibits a local agency, including a city or county,[7] from approving a tentative map, or a parcel map for which a tentative map was not required, unless the agency's legislative body "finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan . . . or any specific plan . . . ." (§ 66473.5.)  The statute further provides:  "A proposed subdivision shall be consistent with a general plan or a specific plan only if . . . the proposed subdivision or land use is compatible with the objectives, policies, general land uses, and programs specified in such [an officially adopted] plan."  (*Ibid.*)

"'Every county and city must adopt a "comprehensive, long-term general plan for the physical development of the county or city . . . ." (Gov. Code, § 65300.)  "The general plan has been aptly described as the 'constitution for all future developments' within the city or county. . . .  '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements' . . . ." [Citations.]  "The consistency doctrine has been described as 'the linchpin of California's land use and development laws; it is the principle which infuse[s] the concept of planned growth with the force of law.' . . .'" [Citation.]" (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 636.)

---

[7]  The Subdivision Map Act defines "[l]ocal agency" as including "a city, county or city and county."  (§ 66420.)

13

In reviewing an agency's consistency findings, our role is the same as the trial court's; we independently review the agency's actions and are not bound by the trial court's conclusions. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 357.) The essential inquiry is whether the agency's consistency findings are supported by substantial evidence in the record, or are "reasonable based on the evidence in the record." (*California Native Plant Society v. City of Rancho Cordova, supra,* 172 Cal.App.4th at p. 637.) An agency errs in finding a proposed subdivision consistent with an applicable general plan "only if . . . no reasonable person could have reached the same conclusion." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 677 (*San Franciscans*).) Reasonable doubts must be resolved in favor of the agency's findings and decision. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors, supra,* at p. 357.)

As courts have consistently emphasized, judicial review of consistency findings is "highly deferential to the local agency." (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors, supra,* 91 Cal.App.4th at p. 357; *San Franciscans, supra,* 102 Cal.App.4th at p. 677; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.) "This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citation.] Because

14

policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes.  [Citations.]  A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.'  [Citation.]"  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* at p. 142.)

As courts have also emphasized, a given project is not required to be in precise or perfect conformity with each and every policy in a comprehensive general plan.  (*Friends of Lagoon Valley v. City of Vacaville, supra,* 154 Cal.App.4th at p. 817; *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511; *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1268-1269.)  Instead, "a proposed subdivision *shall be consistent* with a general plan or a specific plan . . . if . . . the proposed subdivision or land use is *compatible* with the objectives, policies, general land uses, and programs specified in" the applicable plan.  (§ 66473.5, italics added; *San Franciscans, supra,* 102 Cal.App.4th at p. 678.)

As this rule recognizes, "[a] general plan must try to accommodate a wide range of competing interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide

15

development decisions.  Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan.  [Citation.]  It is, emphatically, *not* the role of the courts to micromanage these development decisions." (*Sequoyah  Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719.)

(c)  *Analysis*

RGNC claims insufficient evidence supports the consistency findings because, in making them, the City "cherry-picked a handful of policies" from the land use element of the general plan, while ignoring other policies listed in the "design" and "historic and scenic preservation" elements of the general plan and "aimed at promoting a historical feel."[8]  RGNC complains that the City failed to discuss how the proposed subdivision or

_____

[8]  RGNC claims the City disregarded the following "design" policies of the general plan:  "Preserve awareness of Redlands' heritage as [a] navel orange capital" (3.10a); "Retain the character of the neighborhoods, streets, and buildings that established Redlands' reputation as an ideal Southern California City" (3.10b); and "Establish or reinforce City entrances that announce arrival and convey the spirit of the City" (3.10f), and also disregarded the following "Historic and Scenic Preservation" policies of the general plan:  "Identify, maintain, protect, and enhance Redlands' cultural, historic, social, economic, architectural, agricultural, archeological, and scenic heritage.  In so doing, Redlands will preserve its unique character and beauty, foster community pride, conserve the character and architecture of its neighborhoods and commercial and rural areas, enable citizens and visitors to enjoy and learn about local history" (3.20a); "Foster an understanding and appreciation of history and architecture" (3.20c); "Encourage preservation of and public access to significant scenic vistas, viewpoints and view corridors" (3.20f); "Encourage developers to construct new buildings and settings of such quality that preservationists of the future will wish to protect them.  Encourage appropriate scale, materials, setbacks, and landscaping to enhance the City's beauty and historic fabric" (3.24a); "Encourage historical depictions commemorating historic sites or events in Redlands' history.  Such depictions could be incorporated into new commercial or rehab development projects.  Historical depictions may be monuments, plaques,

*[footnote continued on next page]*

16

project would affect "the uniqueness of the Redlands community character," and argues the City ignored "overwhelming evidence" that TPM 19060 and its "contemporary" design features would adversely affect the historical, "identifiable community character of Redlands."

As respondents point out, RGNC does not claim insufficient evidence supports the City's findings that TPM 19060, and its contemporary design features, were inconsistent with the policies of *the EVCSP* or CP4. Further, the record shows the City did not fail to consider "the unique character of Redlands," or the general plan policies designed to preserve the historical character of Redlands, in finding that TPM 19060 and its contemporary design features were consistent with the policies of the general plan *and* the EVCSP.

As respondents argue, "the General Plan makes quite clear that the purpose for designating the East Valley Corridor area of the City for intense large-scale development (such as the [p]roject) is to protect the overall character of the City." As noted, the general plan envisions the East Valley Corridor as a "high-quality business park environment," and observes that the East Valley Corridor "is the best, perhaps only, location capable of attracting the office, high-tech and distribution jobs the eastern portion of the San Bernardino Valley needs." The EVCSP area is also identified in the

---

*[footnote continued from previous page]*
archeological viewing sites, exhibits, or illustrative art works, such as sculpture, mosaics, murals, tile-work, etc." (3.24d); and "Encourage new construction that ties the new with the old in a harmonious fashion, enhancing the historic pattern" (3.27b).

general plan as including "a site likely to attract San Bernardino County's largest regional shopping center east of Ontario . . . ." The general plan anticipates that the EVCSP "will reduce potential demand for retail, office, and industrial space elsewhere in the [City], thereby neutralizing [development] pressures *that might otherwise change the appearance of the older city*." (Italics added.)

As respondents further explain, the general plan envisions the EVCSP area as a "release valve for intense levels of retail and other development, in order to reduce the demand for such development elsewhere in the City, and thus avoid altering the City's overall character, i.e., the "appearance of the older city." The general plan does not envision the EVCSP area as one in which the historic preservation goals of the general plan will be most directly served. Rather, the EVCSP area is a new, shopping and business park area, to be built on largely vacant land, in which the City hopes to draw new industry, broaden its tax base, and facilitate the creation of 90,000 jobs. In approving TPM 19060 and its contemporary design features, the City struck a reasonable balance between the general plan policies of preserving the "historical feel" of Redlands and the EVCSP's stated policy of "promot[ing] and facilitat[ing] high-quality commercial and industrial development" in the EVCSP area.

RGNC maintains the City disregarded the general plan policy of "[e]ncourag[ing] new construction that ties the new with the old in a harmonious fashion, enhancing the historic pattern" (3.27b), among similar general plan policies. But the record does not support this claim. In its final form, the project incorporated several "Redlands" design

18

elements, including Spanish-style architecture, a corner landscape area featuring citrus trees, and "the generous use of river rock in the overall design."

As RGNC points out, several residents and City officials voiced concern that the project did not incorporate enough historical design elements. For example, during the March 27, 2012, planning commission hearing, commissioner Julie Rock observed: "While the architecture on this project is lovely, *it doesn't say Redlands to me*. It could be anywhere. And I think . . . that is a mistake for this project and for a project that is at such a critical location. There are a zillion and one iconic pieces in Redlands, whether you're talking about street furniture, lighting, architectural elements, public art, even the Zanche that could be incorporated into this project that have not been." (Italics added.)

Contrary to RGNC's suggestion, the City's failure to incorporate *more* Redlands-themed or historical design elements into the project does not mean the project was *incompatable* with the design and historical preservation policies of the general plan. (§ 66473.5.) As noted, general plan policies reflect a range of competing interests, and the agency has broad discretion to weigh and balance these interests in applying its general plan policies. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th at p. 142.) The City reasonably determined that TPM 19060 and its design elements were consistent with the policies of the EVCSP *and* the general plan.

In sum, the City's consistency findings are "reasonable based on the evidence in the record" (*California Native Plant Society v. City of Rancho Cordova, supra,* 172

19

Cal.App.4th at p. 637) and it cannot be said that "no reasonable person could have reached the same conclusion" (*San Franciscans, supra,* 102 Cal.App.4th at p. 677). Accordingly, the City's consistency findings and consequent approval of TPM 19060 must be upheld.

    3.  <u>Section 66474</u>

Similar to section 66473.5, which requires a lead agency to make consistency findings before it may approve a tentative map, section 66474 requires a lead agency to *deny* approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of several findings, including: "(a)  That the proposed map is not consistent with applicable general and specific plans . . . .  [¶]  (b)  That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans . . . [or]  [¶]  . . .  [¶]  (e)  That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat."

In adopting resolution No. 7198 and approving TPM 19060, the City found that the proposed map, and the provisions for its design and improvement, were consistent with the City's general plan and the EVCSP *and* were *not* likely to cause substantial environmental damage.  (§ 66474, subd. (e).)  RGNC claims insufficient evidence supports the City's finding, under section 66474, subdivision (e), that TPM 19060, and the provisions for its design and improvement, were not likely to cause substantial environmental damage.

RGNC complains that in making this finding, the City focused on the undisputed fact that the project site contained no fish- or wildlife-sensitive habitat, but the City did not "squarely address environmental damage in other respects." RGNC points out that, in adopting resolution No. 7193, certifying the EIR for the project, and making CEQA findings, the City found the project would have significant and unavoidable impacts on air quality, at the project level and cumulatively, along with cumulative health and transportation impacts. Based on this finding, RGNC claims insufficient evidence supports the City's section 66474, subdivision (e) finding that the project would *not* likely cause significant environmental damage, and the City's approval of TPM 19060 must therefore be set aside. We disagree.

As respondents point out, Government Code section 66474, subdivision (e) applies only in limited circumstances. Government Code section 66474.01 provides that a public agency may approve a tentative map "[n]otwithstanding subdivision (e) of [Government Code] Section 66474," if an environmental impact report was prepared for the project and a finding was made, under section 21081, subdivision (a)(3) of the Public Resources Code that, "specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report."

In adopting resolution No. 7193, the City certified the EIR for the project and adopted a "statement of environmental effects, mitigation measures, findings, and overriding considerations . . . ." In relevant part, the City found, pursuant to Public Resources Code section 21081, subdivision (a)(3), that all feasible mitigation measures

21

had been adopted to reduce or avoid the significant and unavoidable air quality, health, and transportation impacts identified in the EIR. Thus here, the City was not required to deny approval of TPM 19060, even though it found, as part of its CEQA findings, that the project would result in the environmental impacts on air quality, health, and transportation identified in the EIR. (Gov. Code, §§ 66474, subd. (e), 66474.01.)

RGNC maintains the City's section 66474, subdivision (e) finding that the project was *not* likely to cause significant environmental damages was "a false finding," in light of the City's inconsistent CEQA finding that the project would result in unavoidable impacts on air quality, health, and transportation. As the City concedes, its section 66474, subdivision (e) finding was in error, but RGNC has not demonstrated any resulting prejudice or substantial injury. (§ 65010, subd. (b) ["No action, inaction, or recommendation by any public agency or its legislative body . . . on any matter subject to this title shall be held invalid or set aside by any court . . . by reason of any error . . . unless the court finds that the error was prejudicial and that the party complaining or appealing suffered substantial injury from that error and that a different result would have been probable if the error had not occurred. There shall be no presumption that error is prejudicial or that injury was done if the error is shown."].)

As RGNC concedes, the City could have lawfully approved, and did lawfully approve, TPM 19060, notwithstanding its CEQA findings of adverse environmental impacts, based on its findings pursuant to Public Resources Code section 21081, subdivision (a)(3). (Gov. Code, § 66474.01.)

22

B. *The FEIR Adequately Analyzed the Project's Impacts on Aesthetics, Including Scenic Views and Redlands's "Community Character"*

RGNC claims the FEIR inadequately analyzed the project's impacts on aesthetics—specifically, the impacts of its contemporary design features on the "community character" of Redlands and its impacts on views toward the San Bernardino Mountains. We conclude the FEIR adequately analyzed these impacts, and substantial evidence supports the City's conclusion that the impacts were insignificant.

1. Applicable Legal Principles and Standard of Review

In enacting CEQA, the Legislature declared it is the policy of this state to "[t]ake all action necessary to provide people of this state with . . . enjoyment of aesthetic, natural, scenic, and historic environmental qualities . . . ." (Pub. Resources Code, § 21001, subd. (b).) For purposes of CEQA, "[e]nvironment," means the "physical conditions" existing "within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, [and] objects of historic or aesthetic significance." (Pub. Resources Code, § 21060.5.) An EIR is required to analyze "[a]ll significant effects on the environment of the proposed project." (Pub. Resources Code, § 21100, subd. (b)(1).)

Based on the policy goals of CEQA and the definition of "environment" to include "objects of historic or aesthetic significance" (Pub. Resources Code, §§ 21001, subd. (b), 21060.5) courts have recognized that "aesthetic issues" are properly studied in an EIR, and broadly include impacts on public and private views and on the historic character of

23

the project site and surrounding area.  (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 363, 374-375 (*Eureka Citizens*) [colorful school playground's aesthetic impacts on "historic character" of neighborhood]; *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 937 (*Pocket Protectors*) [visual "tunneling" or "canyoning" effect of "long double rows of houses flanking a narrow private street"]; *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 485, 492 [condominium project's impacts on public and private ocean views]; *Ocean View Estates Homeowners Assn., Inc. v. Monetcito Water Dist.* (2004) 116 Cal.App.4th 396, 402-403 ["overall aesthetic impact" on public and private views of aluminum reservoir cover].)

The lead agency has discretion to determine whether an impact is "significant," however, because the significance of an impact may vary with the environmental setting or "nature of the area affected."  (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 627; *Eureka Citizens, supra,* 147 Cal.App.4th at p. 375; Cal. Code of Regs., tit. 14, § 15064, subd. (b) (the Guidelines).)[9] The agency "'must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting.'"  (*Eureka Citizens, supra,* at p. 376, citing Guidelines § 15064, subd. (b).)  If the

_____

[9] Guidelines section 15064, subdivision (b)(1) states:  "The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data.  An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting. . . ."

24

agency determines an impact is insignificant, the EIR is required to contain "a brief statement addressing the reasons" for the agency's conclusion. (*Eureka Citizens, supra,* at p. 376; Guidelines, § 15128.)

Because an agency's determination of whether an impact is significant is a factual determination, it is reviewed for substantial evidence. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.) "Where an EIR contains factual evidence supporting the conclusion that aesthetic impacts will be insignificant, that conclusion must be upheld." (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors, supra,* 216 Cal.App.4th at p. 627.) Courts "'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.'" (*Mira Mar Mobile Community v. City of Oceanside, supra,* 119 Cal.App.4th at p. 486.)

2. The EIR's Analysis of Aesthetic Impacts, and the City's Conclusions

Chapter 3.1 of the EIR analyzed the project's potential aesthetic impacts. The analysis begins with a description of the project's environmental setting, including the current condition of the project site and its surrounding area. The project site lies just east of Interstate 210 and consists of vacant land, used as an orchard from the 1930's to the early 2000's. Fallow agricultural land lies north and south of the project site, and a residential subdivision lies east and southeast. A 125-acre shopping center, Citrus Plaza, lies to the west of the project site, west of Interstate 210. West San Bernardino Avenue crosses Interstate 210 and connects the 32.97-acre project site with Citrus Plaza. The San

Bernardino Mountains lie approximately 10 miles north of the project site, the San Gabriel Mountains approximately 15 miles northwest. Scenic views of the mountains are visible from most areas of the project site, but existing development obstructs views of the lower portions of the foothills. There are no designated scenic vistas on or adjacent to the project site.

The EIR analyzed four potential aesthetic impacts, using the initial study checklist in appendix G of the Guidelines which recommends that a lead agency, in analyzing potential aesthetic impacts, consider whether the project would (a) have a substantial adverse effect on a scenic vista; (b) substantially damage scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway; (c) substantially degrade the existing visual character or quality of the site and its surroundings; and (d) create a new source of substantial light or glare which would adversely affect day or nighttime views in the area. (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist., supra,* 116 Cal.App.4th 396 at p. 401.) In each of these respects, the EIR concluded the impacts would be less than significant, and set forth a brief statement of the reasons for these conclusions.

In considering the third inquiry under appendix G of the Guidelines—whether the project would substantially degrade the existing visual character or quality of the site and its surroundings—the EIR states the project would "substantially chang[e] the *aesthetic nature*" of the project site because it would "convert predominantly urban vacant land to commercial, retail and restaurant uses," but concluded the project would enhance, not

26

degrade, the aesthetics of the project site. (Italics added.) The EIR explained: "[M]uch of the site is disked on a regular basis and in a blighted condition from illegal dumping activities, and thus would not be considered scenic in nature. . . . [T]he architectural features and landscaping designed for the [p]roject are intended to provide a visually appealing commercial retail development that attracts potential customers. As such, it would be expected to enhance the aesthetics of the [p]roject site."

3. Impacts on the Historic and Agricultural "Community Character" of Redlands

In support of its claim that the EIR inadequately analyzed the potential impacts of the project's contemporary design features on the "community character" of Redlands, RGNC relies on several comments by residents who were critical of the project's contemporary design, or who simply objected to building any Walmart store on the project site or elsewhere in the City. These comments included the following: "Redlands takes pride in its small town image, and this idea [of a Walmart Supercenter on the project site] does not fit into that identity." "This project is not the kind of development we need here in Redlands. It will pave nearly 1.5 million square feet of our city to erect a Wal-Mart and drive-thru restaurants. This is not the type of future we envision for our fair city." "WalMart stands for everything that Redlands residents are against: a community that takes care of its own, and a safe and small town atmosphere with local shop owners. Besides demoralizing local shop owners, this proposed WalMart Super Center site is to be built adjacent to a residential area!" "Redlands is known as an historic town, proud of our small town feel and our heritage." "I believe a development

27

of this size and magnitude will have a destructive impact on Redlands' unique character, quality of life, and sense of community." "We are extremely troubled by . . . . [¶] . . . [¶] [the] [a]esthetics of the mega-retail big box." In addition and as noted above, city planning commissioner Julie Rock commented during one of the planning commission meetings that: "While the architecture on this project is lovely, it doesn't say Redlands to me."

RGNC argues these comments show the EIR inadequately addressed the project's impacts on the "community character" of Redlands. RGNC maintains "[t]he opinions of area residents may be relevant as to the aesthetic impacts of a [p]roject and may constitute substantial evidence to show a [p]roject's significant environmental impacts." This argument is off-base. In support of it, RGNC relies on *Pocket Protectors*, a case that did not involve an EIR but a mitigated negative declaration. *Pocket Protectors* does not assist RGNC's claim.

The petitioners in *Pocket Protectors* challenged a city's approval of a residential project based on a mitigated negative declaration, and sought to compel the city to prepare an EIR analyzing the project's impacts on aesthetics, among other impacts. (*Pocket Protectors, supra,* 124 Cal.App.4th at p. 929.) The appellate court concluded that comments from area residents to the effect that "long double rows of houses flanking a narrow private street" would create a displeasing "tunneling" or "canyoning" effect was sufficient to support a fair argument that the project would have a significant impact on aesthetics. (*Id*. at p. 937; Guidelines, § 15064, subd. (f).) Thus, the court reversed the

28

city's approval of the project based on the mitigated negative declaration and required the city to prepare an EIR. (*Pocket Protectors, supra,* at p. 940.)

The fair argument standard applied in *Pocket Protectors* is a "low threshold" test for requiring the preparation of an EIR. (*Pocket Protectors, supra,* 124 Cal.App.4th at p. 928, citing *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 84.) Though there is substantial evidence to support a fair argument that the project *may have* a significant impact on the aesthetics or visual beauty of the project site and its surrounding area, including what RGNC calls the historic and agricultural "community character" of Redlands, this does not mean the EIR inadequately addressed these potential impacts.

To the contrary, the EIR thoroughly discussed whether the project would substantially degrade the existing visual character or quality of the project site and its surroundings, concluded it would not, and explained why. (Guidelines, §§ 15064, subd. (b), 15128.) The EIR explained the project would "convert predominantly urban vacant land to commercial, retail and restaurant uses," and concluded the project would therefore enhance, not degrade, the aesthetics of the project site and its surrounding area. Substantial evidence supports this conclusion, including evidence that the project's contemporary design features would be aesthetically pleasing.

Additionally, the EIR concluded the project would be of similar land uses, height, and scale as other commercial and retail centers in close proximity to the project site and Interstate 210. Thus, the EIR concluded the project would "not constitute a substantial change in the visual character of the [p]roject area." Substantial evidence also supports

29

this conclusion. A similar shopping center, the Citrus Plaza, is located just west of Interstate 210, near the project site. Though RGNC argues the project's contemporary design features will have a negative aesthetic impact, the City reasonably concluded they would not. "'""""We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable." [Citation.]'"""" (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 921, citing *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1161-1162.)

Finally, the record shows the City heeded residents' complaints about the project's contemporary design features by requiring the project's nine out-parcels to utilize "a heritage theme reminiscent of early Redlands . . . ." Other "Redlands" design features were also incorporated into the project, including a corner landscaped area featuring citrus trees. These Redlands-themed design features further support the City's conclusion that the project would not have a negative aesthetic impact on the project site and surrounding area, including on the historic and agricultural "community character" of Redlands.

### 4. Impacts on Views of the San Bernardino Mountains

RGNC argues the project inadequately addressed the project's impacts on scenic resources, namely, "the scenic vista of residents toward the San Bernardino Mountains," and insufficient evidence supports the City's conclusion that these impacts would be less than significant. We disagree.

30

The EIR acknowledges there are residences located both east and southeast of the project site, and that Karon Street divides the project site from these residences. The EIR states: "The residences most likely affected by the [p]roject are located directly east of the [p]roject site, near Karon Street. Their view of the San Bernardino Mountains (if any) would be oriented to the north, across the [p]roject site. However, the [p]roject will be developed below the Karon Street grade. Consequently, views of the [p]roject site will only be of the upper portion of the Walmart structure, and will be shielded by landscaping. The [p]roject would maintain the block wall and the landscaping."

The EIR also states, "as outlined within EVCSP Compatibility Standards, smaller buildings shall be located near residential uses with larger buildings further away. . . . In addition, a landscape buffer will be located on the west side of Karon Street . . . . This landscape buffer is a requirement of the [EVCSP] and [CP4] . . . . Thus, the proposed land uses and site plan design for the [p]roject will comply with Section EV4.0225 and other applicable policies and will have a less than significant impact to views of the San Bernardino Mountains and other scenic views within the project area."

RGNC argues insufficient evidence supports the City's conclusion that impacts on residents' views toward the San Bernardino Mountains would be less than significant for two reasons: (1) the Walmart store will be 50 feet tall at its highest point, and (2) the EIR failed to address potential impacts on views of the mountains from the residences located southeast, as opposed to directly east, of the project site. Not so.

31

First, RGNC points to no evidence in the administrative record indicating that the 50-foot height of the Walmart store would significantly obstruct views toward the San Bernardino Mountains from the residences located east or southeast of the project site. The EIR assessed the project's potential impacts on the eastern residents' mountain views, and reasonably concluded the impacts would be less than significant because the project would be built below the Karon Street grade.

Second, the EIR acknowledged there were residences located directly east *and* southeast of the project site, but stated "[t]he residences most likely affected by the [p]roject" were the residences located directly east of the project site. The EIR indicated that the impacts on mountain views from the residences located both east and southeast of the project site would be less than significant, and substantial evidence supports this conclusion. The record shows the southeastern residences were a significant distance away from the project site. In addition, the photographs in the EIR support the City's conclusion the project would not obstruct the mountain views (if any) from the southeastern residences—any more than it would obstruct views from the eastern residences. RGNC's contrary argument is speculative; it is not based on any evidence in the administrative record.

RGNC relies on *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist., supra*, 116 Cal.App.4th 396, another case involving a mitigated negative declaration, for the proposition that the agency was not relieved from considering the impact of its project on private views. This point is not disputed. The City assessed the

32

project's impacts on private views of the San Bernardino Mountains from area residences, and substantial evidence supports the City's conclusion that such aesthetic impacts were insignificant.

C. *The EIR Adequately Addressed the Project's Consistency with the General Plan*

Lastly, RGNC claims the EIR inadequately addressed inconsistencies between the project and the City's general plan policies. An EIR is required to discuss any inconsistencies between the project and applicable general and regional plans. (Guidelines, § 15125, subd. (d).) But here, the EIR discussed the applicable regulatory framework, including the general plan policies RGNC claims were inconsistent with the project, and reasonably concluded the project was not inconsistent with any of these general plan policies. For the reasons discussed in section III.A., substantial evidence supports the City's conclusions.

## IV. DISPOSITION

The judgment denying RGNC's writ petition and dismissing its complaint is affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

J.


We concur:

McKINSTER _____

33

Acting P. J.

CODRINGTON

J.